UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RONALD DOANE,

                              Plaintiff,

     -v-                                        5:13-CV-1423


UNITED STATES OF AMERICA;
DEPARTMENT OF HEALTH AND HUMAN
SERVICES AT THE FAMILY HEALTH
NETWORK OF CENTRAL NEW YORK, INC.;
CORTLAND REGIONAL MEDICAL CENTER;
DIEGO ALVAREZ, M.D.; and DILIP
ROY, M.D.,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                          OF COUNSEL:

DEFRANCISCO & FALGIATANO, LLP          CHARLES L. FALGIATANO, ESQ.
Attorneys for Plaintiff
121 East Water Street
Syracuse, NY 13202

HON. GRANT C. JAQUITH                  WILLIAM F. LARKIN, ESQ.
United States Attorney for the         Ass't United States Attorney
     Northern District of New York
Attorneys for Defendants United States of
     America and Department of Health and
     Human Services at the Family Health
     Network of Central New York, Inc.
Syracuse Office
100 South Clinton Street
P.O. Box 7198
Syracuse, NY 13261

Albany Office                          CATHLEEN B. CLARK, ESQ.
James T. Foley U.S. Courthouse         Ass't United States Attorney
445 Broadway
Albany, NY 12207

LEVENE GOULDIN & THOMPSON, LLP          JUSTIN L. SALKIN, ESQ.
Attorneys for Defendant Cortland Regional
    Medical Center
Vestal Office
450 Plaza Drive
Vestal, NY 13850

Binghamton Office                                    JOHN J. POLLOCK, ESQ.
P.O. Box F-1706
Binghamton, NY 13902

ASWAD & INGRAHAM                           THOMAS A. SAITTA, ESQ.
Attorneys for Defendants Alvarez and Roy
46 Front Street
Binghamton, NY 13905


DAVID N. HURD
United States District Judge

# TABLE  OF  CONTENTS

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

II.     PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

III.    BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

        A.    Relevant Medical Terminology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

        B.    Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
              1.    The March 14, 2006 CT Scan. . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
              2.    The June 30, 2009 CT Scan. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
              3.    The January 26, 2010 CT Scan. . . . . . . . . . . . . . . . . . . . . . . . . .  14
              4.    The April 14, 2010 CT Angiogram. . . . . . . . . . . . . . . . . . . . . . . . .  14
              5.    The December 8, 2011 CT Scan. . . . . . . . . . . . . . . . . . . . . . . . . .  15
              6.    The December 21, 2011 Urology Consultation. . . . . . . . . . . . . . .  15
              7.    The January 5, 2012 Ultrasound. . . . . . . . . . . . . . . . . . . . . . . . . .  16
              8.    The February 8, 2012 Urology Appointment. . . . . . . . . . . . . . . . .  16
              9.    The March 5, 2012 Surgery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
              10.   The June 20, 2012 Urology Follow-Up. . . . . . . . . . . . . . . . . . . . .  17

        C.    Conflicting Expert Opinions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
              1.    Plaintiff's Experts:  Dr. Weinberg and Dr. Bernie. . . . . . . . . . . . . .  18
                    a.    Dr. Weinberg. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
                    b.    Dr. Bernie. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
              2.    Defendant CRMC's Expert:  Dr. Poiesz. . . . . . . . . . . . . . . . . . . . .  21
              3.    Defendant Government's Expert:  Dr. Kaufman. . . . . . . . . . . . . . .  21

IV.     LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

        A.    Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

        B.    Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

V.      DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

        A.    Plaintiff's Motion to Amend. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27
              1.    FHN's Receipt of the March 14, 2006 CT Scan Report. . . . . . . . . . . .  28
              2.    Accrual of the 2006 Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35
              3.    Timeliness of the 2006 Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36
              4.    Amendment of Standard Form 95. . . . . . . . . . . . . . . . . . . . . . . . . .  38

        B.    Dr. Bernie's Opinion as to the March 14, 2006 CT Scan. . . . . . . . . . . . . .  40

C.     Plaintiff's Medical Malpractice Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

VI.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

<h2 style="text-align:center"><u>MEMORANDUM–DECISION and ORDER</u></h2>

## I. <u>INTRODUCTION</u>

Plaintiff Ronald Doane ("Doane" or "plaintiff") filed this medical malpractice action seeking compensatory damages for injuries he allegedly sustained by the named defendants' failure to diagnose and treat his kidney cancer. Plaintiff's operative complaint contains two causes of action: (1) failure to timely diagnose, and delay in treating plaintiff's kidney cancer, and (2) failure to obtain plaintiff's informed consent. Both theories of liability are based on various alleged deviations from the standard of care.

These theories are pleaded against three remaining groups of defendants:

First, Doane asserts a medical malpractice claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346(b), for deviation from the standard of care against defendant United States of America. This claim relates to the care plaintiff received at the federally funded Family Health Network of CNY, Inc. ("FHN").[1]

Second, plaintiff asserts a medical malpractice claim under state law for deviation from the standard of care against defendant Cortland Regional Medical Center ("CRMC"). This claim relates to the care plaintiff received at CRMC.

---

[1] The initial federal complaint named only defendant United States of America, but summonses were issued to the United States Attorney's Office in Syracuse, New York; the Attorney General of the United States in Washington, D.C.; and the *Department of Health and Human Services at the Family Health Network of Central New York, Inc.*, also in Syracuse, New York. FHN was thereafter added as a defendant on the docket. The Amended Complaint included additional defendants but the United States of America remained the only specifically named federal defendant on the pleadings.

To reiterate, FHN is not specifically included as a named defendant on the Amended Complaint nor on the caption of any submissions, however, it remains on the docket. The United States Attorney's Office appeared for the United States of America, "through the Department of Health and Human Services," and its motion papers and submissions reflect that. It is clear that its position relates to the conduct which occurred at FHN. Accordingly, the United States of America, on behalf of FHN, will be referred to as the "Government."

Finally, Doane asserts a medical malpractice claim under state law for deviation from the standard of care against defendants Diego Alvarez, M.D. ("Dr. Alvarez") and Dilip Roy, M.D. ("Dr. Roy") (collectively the "doctor defendants"). This claim relates to the care plaintiff received from these two doctors, while at CRMC.

After discovery, the parties moved for the following relief:

Defendant CRMC moved to strike and/or preclude a portion of plaintiff's supplemental expert disclosure and also moved for summary judgment dismissing the Amended Complaint. Plaintiff responded in opposition and CRMC replied in further support of its motion.

The doctor defendants moved for summary judgment dismissing the Amended Complaint. Plaintiff did not directly respond in opposition, but does address some arguments in his cross-motion to amend. The doctor defendants replied in further support of their motion.

Defendant Government moved for summary judgment dismissing the Amended Complaint. Plaintiff did not directly respond in opposition, but does address some arguments in his cross-motion to amend.

Thereafter, Doane cross-moved for leave to serve a Second Amended Complaint ("SAC") and an amended Standard Form 95. Plaintiff seeks to assert additional allegations of malpractice and negligence. The Government responded in opposition. CRMC, by way of its initial motion, also opposes plaintiff's proposed amendments.

All motions were considered on the basis of the submissions and without oral argument.

## II. **PROCEDURAL HISTORY**

On or about May 10, 2012, Doane filed an administrative claim with the Department of Health and Human Services ("DHHS"). Clark Aff., May 31, 2016, Ex. G ("DHHS Complaint"). He alleged that his primary care provider at FHN failed to follow-up after receiving medical records showing a lesion on his right kidney.

On July 11, 2012, Doane commenced a medical malpractice action against certain individual physicians employed by, or agents of, CRMC in New York State Supreme Court, Cortland County. Defendants in that action included CRMC, Dr. Alvarez, Dr. Roy, James Newman, M.D. ("Dr. Newman"), and Srinadh Yarra, M.D. ("Dr. Yarra"). Clark Aff., May 31, 2016, Ex. F ("State court complaint"). Each of the aforementioned defendants answered separately and cross-claimed against the other defendants for contribution.

With Doane's administrative claim pending with DHHS, discovery began in the state court action. On November 14, 2013, while his DHHS Complaint was still under review, plaintiff commenced this action in the United States District Court for the Northern District of New York, asserting claims under the FTCA against his primary care provider FHN, and named the United States of America as defendant. The Government answered.

On or about March 12, 2014, DHHS denied plaintiff's administrative claim on the basis that he commenced this action in federal court. Clark Aff., Sept. 16, 2016, Ex. G. Thereafter, Doane requested and was granted permission to amend his federal complaint and join the pending state court action.

On April 24, 2014, Doane filed and served an Amended Complaint on defendants United States of America, CRMC, Dr. Alvarez, Dr. Roy, Dr. Newman, and Dr. Yarra. As indicated above, the Amended Complaint alleges two causes of action: (1) negligence

against all defendants for deviating from the applicable standard of care by failing to diagnose or treat the lesion on plaintiff's kidney, and (2) negligence against all defendants based on a failure to obtain plaintiff's informed consent.

All defendants answered and cross-claimed against the other defendants for contribution. Each defendant thereafter answered the cross-claims against it. The parties then stipulated to the dismissal of Dr. Newman and Dr. Yarra from the action. Discovery followed.

## III. BACKGROUND

### A. Relevant Medical Terminology

The following is a brief summary of some of the medical terms that are relevant to plaintiff's allegations; these definitions do not constitute findings of fact as to any issues in this case.

A computerized tomography ("CT") scan combines a series of X-ray images taken from different angles around the body and uses computer processing to create cross-sectional images (slices) of the bones, blood vessels, and soft tissues inside the body.[2] CT scan images provide more detailed information than plain X-rays.[3] A CT angiogram is a type of medical test that combines a CT scan with an injection of a special dye to produce pictures of blood vessels and tissues in a part of the body.[4] The dye is injected through an

---

[2] Mayo Clinic, CT scan, https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675 (last visited March 27, 2019).

[3] Id.

[4] Johns Hopkins Medicine, Computed Tomography Angiography, https://www.hopkinsmedicine.org/healthlibrary/test_procedures/cardiovascular/computed_tomography_angiography_135,15 (last visited March 27, 2019).

intravenous ("IV") line.[5]  Diagnostic ultrasound, also called sonography, is an imaging method that uses high frequency sound waves to produce images of structures within the body.[6]  The images can provide valuable information for diagnosing and treating a variety of diseases and conditions.[7]

With respect to kidney anatomy, kidneys have a superior and inferior pole, medial and lateral margins, and an anterior and posterior surface.[8]  The perinephric area refers to the connective and fatty tissue surrounding a kidney.[9]  The renal sinus is the main cavity of the kidney that is an expansion behind the hilum and contains the renal pelvis, calyxes, and the major renal vessels.[10]

A hypoechoic mass is tissue in the body that is more dense or solid than usual; it is a mass that appears darker on an ultrasound than the surrounding tissue.[11]  A hypodense mass means less dense than average.[12]  The terms "tumor," "mass," or "lesion" are used to

---

[5]  Id.

[6]  Mayo Clinic, Ultrasound, https://www.mayoclinic.org/tests-procedures/ultrasound/about/pac-20395177 (last visited March 27, 2019).

[7]  Id.

[8]  Interactive Biology, The Anatomy of a Kidney, http://www.interactive-biology.com/3254/the-anatomy-of-the-kidney/ (last visited March 27, 2019).

[9]  Merriam-Webster Dictionary, Perirenal, https://www.merriam-webster.com/medical/perirenal (last visited March 27, 2019).

[10]  Merriam-Webster Dictionary, Renal sinus, https://www.merriam-webster.com/medical/renal%20sinus (last visited March 27, 2019).

[11]  Healthline, What Is a Hypoechoic Mass?, https://www.healthline.com/health/hypoechoic-mass (last visited March 27, 2019).

[12]  The term "density" is sometimes used to refer to the degree that a body structure or substance appears dark on an X-ray or CT scan.  Different body structures and substances absorb X-rays at different rates.  Blood and bone absorb X-rays at a high rate and appear white; they are referred to as areas of high density.  Air and water absorb X-rays at low rates and appear black; they are referred to as areas of low

(continued...)

describe an abnormal growth.[13]  Tumors can be benign (non-cancerous) or malignant (cancerous).[14]  A fluid-filled sac, called a cyst, is the most common growth found in a kidney.[15]  Cysts are mostly non-cancerous.[16]  By contrast, a solid tumor is an abnormal mass of tissue that usually does not contain cysts or liquid areas.[17]  Solid tumors may be benign or malignant.[18]  Different types of solid tumors are named for the type of cells that form them.[19]  Examples of solid tumors are sarcomas, carcinomas, and lymphomas.[20]  Carcinoma is a cancer that begins in the skin or in tissues that line or cover internal organs.[21]

Papillary renal cell carcinoma is a type of kidney cancer that forms in cells that line the small tubes in the kidney that filter waste from the blood and make urine.[22]  There are two

---

[12](...continued)
density.  See MedFriendly, http://www.medfriendly.com/low-density-brain-ct.html (last visited March 27, 2019).

[13]  Urology Care Foundation, Kidney Cancer, https://www.urologyhealth.org/urologic-conditions/kidney-cancer (last visited March 27, 2019).

[14]  Id.

[15]  Id.

[16]  Id.

[17]  National Cancer Institute Dictionary of Cancer Terms, Solid tumor, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/solid-tumor (last visited March 27, 2019).

[18]  Id.

[19]  Id.

[20]  Id.

[21]  Id., Carcinoma, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/carcinoma (last visited March 27, 2019).

[22]  National Cancer Institute Dictionary of Cancer Terms, Papillary renal cell carcinoma, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/793856 (last visited March 27, 2019).

types of papillary renal cell carcinoma: type 1 and type 2.[23]  Type 1 tends to grow slowly and spread to other parts of the body less often than type 2.[24]

Cancer staging refers to the extent of a cancer, such as how large the tumor is, and if it has spread.[25]  Tumors are staged by a classification system, with the "TMN" system being the most widely used cancer staging system.[26]  The T refers to the size and extent of the main tumor; the N refers to the number of nearby lymph nodes that have cancer; and the M refers to whether the cancer has metastasized.[27]  Metastasized means that the cancer has spread from the primary tumor to other parts of the body.[28]  By taking these factors into account, tumor staging is used to help estimate a patient's prognosis.[29]

In the context of renal cell carcinomas, T1 tumors are those that are confined to the kidney, meaning they have not metastasized or spread, and are less than or equal to 7 cm.[30]  T1 tumors are then subclassified as either T1a or T1b.[31]  T1a tumors have not metastasized

---

[23]  Id.

[24]  Id.

[25]  National Cancer Institute Dictionary of Cancer Terms, Cancer Staging, https://www.cancer.gov/about-cancer/diagnosis-staging/staging (last visited March 27, 2019).

[26]  Id.

[27]  Id.

[28]  National Cancer Institute Dictionary of Cancer Terms, Metastasize, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/metastasize (last visited March 27, 2019).

[29]  National Cancer Institute Dictionary of Cancer Terms, Cancer Staging, https://www.cancer.gov/about-cancer/diagnosis-staging/staging (last visited March 27, 2019).

[30]  American Cancer Society, Kidney Cancer Stages, https://www.cancer.org/cancer/kidney-cancer/detection-diagnosis-staging/staging.html  (last visited March 29, 2019).

[31]  Id.

and are less than or equal to 4 cm in greatest dimension.[32]  T1b tumors have not

metastasized and are greater than 4 cm but less than or equal to 7 cm in greatest

dimension.[33]

### B.  Relevant Facts

The facts are largely undisputed.  They are drawn from the undisputed facts in

defendants' Statements of Material Facts, plaintiff's Response Statements of Material Facts,

and the exhibits and affidavits submitted in connection with the motions.  Where the facts

stated by the moving parties are supported by testimonial or documentary evidence, and

denied with only a conclusory statement, or not denied at all, those facts are found to be true.

See Local Rule 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set

forth in the Statement of Material Facts that the opposing party does not specifically

controvert.").

At all relevant times, plaintiff received his primary care at FHN.  FHN is a community

health center that is funded under the Health Center Program, Section 330 of the Public

Health Service Act, 42 U.S.C. § 254b.  The facts relevant to this case begin in or around

March 2006 and only those facts relevant to the instant matter are included.

### 1.  The March 14, 2006 CT Scan

Doane was admitted to CRMC in March 2006 for a small bowel obstruction.  During

that hospital admission, a CT scan of his abdomen and pelvis was performed on March 14,

2006.  The radiologist who interpreted that study reported the presence of a 2.1 x 1.3 cm

---

[32] Id.

[33] Id.

subcapsular lesion[34] in the mid pole of his right kidney.  The radiologist indicated that he believed the lesion was likely to be a renal cyst, but recommended confirmation by renal sonography.

During this hospitalization, Esther Steinberg, M.D. ("Dr. Steinberg") of FHN completed a consultation of plaintiff on March 15, 2006 at CRMC.  Dr. Steinberg produced a consultation note dated the same day, which mentioned a right kidney lesion seen on CT scan, but did not mention the recommendation for a follow-up.

CRMC contends it sent a copy of the March 14, 2006 CT scan report to FHN, plaintiff's primary care provider.  It is undisputed Doane's FHN chart includes evidence of a CT scan during his March 2006 CRMC admission and the findings of that scan.[35]

Despite this, CRMC nor FHN informed Doane of the March 14, 2006 CT scan findings or ordered any follow-up, including a renal sonography.

### 2.  The June 30, 2009 CT Scan

On June 30, 2009, Doane was admitted to CRMC when he presented to the Emergency Room with complaints of abdominal and chest pain.  A CT scan of the abdomen and pelvis was performed at that time and interpreted by a CRMC radiologist.  The radiology report for the June 30, 2009 CT scan documented the presence of a 4.5 x 4.1 cm lesion in the lower pole of the right kidney that had increased from 2.3 x 2.0 cm when it was seen in March 2006.  On the June 30, 2009 radiology report , the radiologist recommended

---

[34]  A subcapsular lesion means a lesion situated or occurring beneath or within a capsule. Merriam-Webster Dictionary, Subcapsular, https://www.merriam-webster.com/dictionary/subcapsular (last visited March 27, 2019).

[35]  Discussion of plaintiff's cross-motion to amend includes a detailed timeline of what, if any, records relating to the March 2006 CRMC admission were made a part of Doane's FHN chart.  See discussion supra part V.A.1.

sonography and/or CT scan of the abdomen with IV contrast to determine if this was a solid renal mass lesion.  Plaintiff was discharged from CRMC on July 4, 2009.

CRMC sent a copy of the June 30, 2009 CT scan report to FHN, plaintiff's primary care provider.  It is undisputed FHN received the June 30, 2009 CT scan report.

Despite this, CRMC nor FHN informed Doane of the June 30, 2009 CT scan findings or ordered any follow-up, including sonography and/or CT scan of the abdomen with IV contrast.

### 3.  The January 26, 2010 CT Scan

Plaintiff returned to CRMC on January 26, 2010 with complaints of rectal bleeding.  A CT scan of Doane's abdomen and pelvis with contrast was obtained on January 26, 2010 and interpreted by a radiologist at CRMC.  The radiology report for that study documented a 4.7 cm hypodense mass in the lower pole of the right kidney.  The CRMC radiologist noted the density measurements for the mass were higher than expected for a cyst and questioned "complex cyst versus solid mass/neoplasm."  He recommended a follow-up with sonography to determine if it was a solid mass or a cyst.

CRMC sent a copy of the January 26, 2010 CT scan report to FHN, plaintiff's primary care provider.  It is undisputed FHN received the January 26, 2010 CT scan report.

Despite this, CRMC nor FHN informed Doane of the January 26, 2010 CT scan findings or ordered any follow-up, including sonography.

### 4.  The April 14, 2010 CT Angiogram

Doane's next admission to CRMC occurred on April 14, 2010 when he presented to the CRMC Emergency Department with complaints of chest pain.  A CT angiogram of the chest was performed at CRMC and the study was interpreted by a CRMC radiologist.  The

radiologist noted the presence of a 4.7 cm x 4.6 cm rounded area at the lower pole of the right kidney. The radiologist recommended follow-up of this finding with a renal ultrasound to rule out a solid lesion. Doane was discharged from CRMC on April 16, 2010.

CRMC sent a copy of the April 14, 2010 CT angiogram report to FHN, plaintiff's primary care provider. It is undisputed FHN received the April 14, 2010 CT angiogram report.

Despite this, CRMC nor FHN informed Doane of the April 14, 2010 CT angiogram findings or ordered any follow-up, including a renal ultrasound.

### 5. **The December 8, 2011 CT Scan**

On December 8, 2011, Doane was seen by Dr. Catherine Keating at FHN for complaints of abdominal discomfort. Dr. Keating ordered lab work and an abdominal CT scan, which was performed on an out-patient basis at CRMC on December 8, 2011. The radiology report for the December 8, 2011 CT scan noted the presence of a 4.9 x 4.8 cm solid mass lesion along the lower pole of the right kidney and stated that renal cell carcinoma was the most likely etiology. The radiologist recommended follow-up with urology. That report also noted "[a] tiny subcapsular structure is seen in the mid pole of the left kidney measuring 9 x 9 mm which was not seen on prior examination in 2009 possibly of solid or cystic etiology."

Dr. Keating called Doane to tell him about the findings and referred him to a urologist.

### 6. **The December 21, 2011 Urology Consultation**

On December 21, 2011, Doane was seen by urologist, Dr. Gennady Bratslavsky. Dr. Bratslavsky reviewed plaintiff's films and noted the presence of the solid mass along the lower pole of the right kidney with dimensions of 4.9 x 4.8 cm. Based on these dimensions,

the mass was at a stage T1b.  Dr. Bratslavsky also noted that plaintiff's films showed a tiny subcentimeter lesion along the mid pole of the left kidney that was too small to characterize.

During his initial consultation with Dr. Bratslavsky, Doane was counseled by Dr. Bratslavsky to wait three to six months to see what happened with the right kidney mass during that period of time.

### 7.  The January 5, 2012 Ultrasound

On January 5, 2012, at Dr. Bratslavsky's request, Doane underwent a renal ultrasound.  That ultrasound report documented a solid renal mass arising from the lower pole of the right kidney measuring 5.3 x 6.3 cm that was suspicious for renal cell carcinoma. An "indeterminate" 1.7 cm hypoechoic left renal lesion was also seen on the ultrasound, but was too small to accurately characterize.

### 8.  The February 8, 2012 Urology Appointment

At an appointment on February 8, 2012, Dr. Bratslavsky offered Doane a partial and radical nephrectomy as viable treatment options for the right renal mass.  He informed Doane that he was a "big proponent of nephron sparing" (i.e. a partial nephrectomy versus a complete nephrectomy).  Nephrectomy is surgery to remove a kidney or part of a kidney.[36]  In a partial nephrectomy, part of one kidney or a tumor is removed, but not an entire kidney.[37] In a radical nephrectomy, an entire kidney, nearby adrenal gland and lymph nodes, and other surrounding tissue are removed.[38]

---

[36]  National Cancer Institute Dictionary of Cancer Terms, Nephrectomy, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/nephrectomy (last visited March 27, 2019).

[37]  Id.

[38]  Id.

Prior to Doane's surgery, Dr. Bratslavsky's discussed surgical options with Doane on "several occasions" and told him that a "partial nephrectomy would be in his best interest long-term."  Plaintiff was concerned about undergoing a partial nephrectomy in light of the potential increase in complications such as bleeding and urinary leak.

In his own words, Dr. Bratslavsky made every effort to convince Doane to undergo a partial nephrectomy instead of a radical nephrectomy.  Plaintiff chose to undergo a radical nephrectomy.

### 9.  The March 5, 2012 Surgery

Dr. Bratslavsky re-visited the partial versus radical nephrectomy with Doane on the morning of the surgery, but plaintiff was adamant that he wanted the entire kidney out.  Dr. Bratslavsky then performed the radical nephrectomy on March 5, 2012 at Upstate University Hospital.

The surgery went well and Doane was discharged on March 8, 2012.  The pathology report from surgery showed that the mass was a papillary type I renal cell carcinoma. According to the pathology report, the mass was isolated, self-contained and encapsulated, and did not extend through the perinephric area or into the renal sinus.  The largest dimension of the mass was 6.1 cm.  All margins were negative, meaning that the outer most edges of the resected specimen were free of cancer.  Plaintiff's mass was staged as a T1b.

### 10.  The June 20, 2012 Urology Follow-Up

Doane visited Dr. Bratslavsky on June 20, 2012 for a follow-up appointment.  At that time, he advised plaintiff they would need to continue to monitor the left kidney, "especially in the history of papillary renal cell carcinoma and its association with multifocality and

bilaterality."  Multifocal, meaning this type of cancer is known by its genetics to appear in more than one location, and bilateral, meaning it is known to appear in both kidneys.

As of the date of the underlying submissions in connection with these motions, Doane has continued to do well after surgery and there is no evidence of metastatic disease. Plaintiff has maintained an active lifestyle.

## C.  Conflicting Expert Opinions

The parties have submitted the following opinions from medical experts who disagree as to whether any delay or deviation of the care and treatment by FHN, CRMC, and/or the doctor defendants, respectively, caused injury to plaintiff.

### 1.  Plaintiff's Experts:  Dr. Weinberg and Dr. Bernie

### a.  Dr. Weinberg

Marc S. Weinberg, M.D., F.A.C.P., F.A.S.N., F.A.H.A., is a Board Certified Physician in Internal Medicine and Nephrology.  Dr. Weinberg states in his expert disclosure that it is his opinion that the care rendered to Doane was beneath the standard of care.  His report notes that each of the scans completed on June 30, 2009, January 26, 2010, and April 14, 2010, and the findings respectively, "required further evaluation and such evaluation may have included radio ablation of the cancer, cauterization of the tumor, genetic testing of the tissue and a partial or complete nephretcomy."  See Pollock Aff., May 27, 2016, Ex. 14 ("Dr. Weinberg report").  Dr. Weinberg further opines that "[i]t is my opinion the tumor should have been diagnosed as cancer in 2009/2010 [sic].  At that point treatment would have most likely been surgical removal of the tumor and/or possibly the kidney and a referral to an oncologist for further evaluation."  Id.

### b. **Dr. Bernie**[39]

Jonathan Bernie, M.D., is a Board Certified Physician in Urology. In his expert report, Dr. Bernie notes that the final diagnosis after Doane's right radical nephrectomy was a 6 cm papillary renal cell carcinoma and "[l]ater that same year, during routine surveillance, a small tumor was identified in his left kidney, which has not been definitively characterized or diagnosed, but appears to be increasing in size (from 0.8 cm to 1.3 cm)." See Pollock Aff., May 27, 2016, Ex. 16 ("Dr. Bernie report"). Dr. Bernie's report indicates that management options for solid renal tumors include surveillance, percutaneous or laparoscopic ablative therapy (radiofrequency ablation or cryoablation),[40] and surgical removal (partial or radical/total nephrectomy). He opines that "[t]reatment recommendations are based upon many factors, including, but not limited to patient age, medical comorbidities, life expectancy, and size/location of the tumor. If untreated, these tumors typically grow slowly (approximately 0.8 cm/year)." Id. He continues that surgical therapy is typically advised for patients who are young and otherwise healthy. "At the time (2006) of his [Doane's] radiographic diagnosis, percutaneous ablative therapy was typically limited to small tumors (< 4 cm)."

Dr. Bernie opines that tumor size is an important prognostic indicator. "Patient survival and outcome is better for small tumors. Development of metastatic disease and risk of death from renal cell carcinoma correlates with tumor size." Dr. Bernie further opines that

---

[39] Dr. Bernie is plaintiff's supplemental expert, disclosed in January 2016.

[40] In medicine, ablation is the removal or destruction of a body part or tissue or its function. See National Cancer Institute Dictionary of Cancer Terms, Ablation, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/ablation (last visited March 27, 2019). Ablation may be performed by surgery, hormones, drugs, radiofrequency, heat, or other methods. Id.

"[t]here is a very low risk (< 2%) of metastases in patients with tumors < 3 cm.  For patients with bilateral asynchronous tumors, the primary free interval had prognostic significance for disease specific survival."  Further, diabetes is also associated with poorer outcomes in patients with renal cell carcinoma.

Dr. Bernie states in his expert report that Doane was 44 years old when his 2 cm renal tumor was first diagnosed and "[d]ue to an unfortunate lack of communication and attention to detail among several doctors at Cortland Regional Medical Center on several occasions, his treatment was delayed 6 years until he was 50 years old, at which time his tumor had grown significantly."  Dr. Bernie concludes that the delay in plaintiff's diagnosis "did affect his ability to pursue a minimally invasive treatment for this tumor."  He further opines:

> More importantly, this delay could significantly affect his future
> health and life expectancy.  Additionally, the development of a
> growing lesion in his solitary kidney is also cause for concern.
> Although it does not have characteristics currently diagnostic of a
> malignancy, its appearance and growth raise the distinct
> possibility of a metachronous[41] or metastatic lesion.

Dr. Bernie concludes that the six year delay in treatment of Doane's kidney cancer "places him at increased risk for developing future metastatic disease and consequently a poorer prognosis."

Dr. Bernie has since submitted an affirmation in connection with plaintiff's cross-motion to amend ("Dr. Bernie affirmation").  In his affirmation, Dr. Bernie states that with respect to the March 14, 2006 CT scan at CRMC, it did not appear upon his initial review in this case that either Doane or his primary care provider was informed of the findings.  Id. ¶ 5. However, plaintiff's counsel contacted Dr. Bernie in August 2016 and advised him that it

---

[41] Metachronous means a second tumor developing consequently in the opposite kidney.

appeared plaintiff's primary care provider, FHN, did in fact receive the report.  Id. ¶ 6.  Dr.

Bernie again opines that the six year delay in diagnosis "did affect his ability to pursue a

minimally invasive treatment for this tumor.  More importantly, this delay could significantly

affect his future health and life expectancy."  Id. ¶ 8.

### 2.  Defendant CRMC's Expert:  Dr. Poiesz

Bernard J. Poiesz, M.D., is an oncologist.  Dr. Poiesz states that when Doane

ultimately underwent nephrectomy on March 5, 2012, he was found to have a 6 cm, T1b, No,

Mo or stage IB renal cell carcinoma.  See Pollock Aff., May 27, 2016, Ex. 17 ("Dr. Poiesz

report").  Dr. Poiesz opines that the lesion measurements indicated from the June 30, 2009,

April 14, 2010, and December 8, 2011 scans indicate that the tumor would also have been

staged as T1b, No, Mo stage IB at these time periods.  He states that the therapy for such a

tumor would be surgery and in all instances, plaintiff could have opted for a partial

nephrectomy, but ultimately chose a complete nephrectomy.  Dr. Bernie further opines:

> The five year disease free and overall survival rates for a stage IB
> renal cell carcinoma following nephrectomy would be about 90%
> and 80% respectively, and would have been the same for all time
> periods.  However, [at the time of this writing] it is now more than
> four years since the patient was treated and he has not had a
> disease recurrence.  Hence, the survival figures above would
> improve by over 5%.

### 3.  Defendant Government's Expert:  Dr. Kaufman

Ronald P. Kaufman, M.D., F.A.C.S., is a Board Certified Physician in Urology.  In his

expert report, Dr. Kaufman explains that the initial stage of Doane's cancer "at the time of

presentation (6/30/09) was T1b and the stage of cancer at the time of surgery was T1b.

Hence, although the tumor was slightly larger when removed compared to when first noted

on CT scan the stage did not change, hence the long term prognosis remains the same."

<u>See</u> Clark Aff., May 31, 2016, Ex. M ("Dr. Kaufman report").  With respect to whether ablation could have treated plaintiff's tumor, Dr. Kaufman opines that "even if it had been noted in 2009 when it was 4.5 cm . . . it would have been too large and he [Doane] would have been too young and healthy to be advised to undergo this modality as it is inferior to surgery as a means to cure him of the cancer."  Dr. Kaufman contends this is backed up by the American Urological Association's published Guidelines for Management of the Clinical Stage 1 Renal Mass (the "AUA Guidelines").

With reference to benefit from partial versus total nephrectomy, Dr. Kaufman opines that the tumor did not change dramatically from when initially noted on CT scan and Doane could have had a laparoscopic partial nephrectomy if he so desired.  He continues, "[t]he fact of the matter is that a randomized trial in Europe comparing the outcomes of partial and total nephrectomy by Van Poppel has shown that the beneficial impact of nephron sparing surgery (partial nephrectomy) on estimated glomerular filtration rate (kidney function) has not resulted in improved survival."  Thus, according to Dr. Kaufman, Doane did not compromise his long term survival by having a total nephrectomy.

Finally, concerning the left kidney lesion and whether the lesion may prove to be cancer or could have been prevented by earlier surgery, Dr. Kaufman opines that he does not believe this to be the case.  This is so because Doane's cancer was a papillary renal cell carcinoma "which is known to be often multifocal and bilateral based on its genetics.  Hence earlier surgery would not have had an impact on the presence of a separate lesion in the other kidney."  <u>Id</u>.

In his affidavit in connection with the Government's motion for summary judgment, Dr. Kaufman explains that the critical medical principle in this case is that "*the stage of a tumor is*

*the prognosticator, not the size of the mass*." See Clark Aff., May 31, 2016, Ex. N, ¶ 25 ("Dr. Kaufman affidavit").  He further explains that "[l]ay people often believe that a patient's prognosis depends on the size of a mass, but that is not the case.  As long as the tumor stage has not changed, the prognosis for the patient remains the same, even if the tumor grows in size." Id.  In Dr. Kaufman's expert opinion, the stage of Doane's right renal mass did not change from 2009 to 2012 and was always a stage T1b, an opinion he asserts is consistent with and supported by the AUA Guidelines.  Id. ¶ 26.

Dr. Kaufman continues on to explain that tumor stage is the best predictor of a patient's prognosis.  "In this case, although the right renal mass was slightly larger when it was removed in 2012 than it was in 2009, Mr. Doane's long-term prognosis in 2012 was the same as it would have been in 2009 because it was always a stage T1b mass." Id. ¶ 28.  He opines that "[t]here is simply no basis to claim that Mr. Doane's prognosis would have been better in 2009 than it was in 2012." Id.  Dr. Kaufman disputes Dr. Bernie's opinion that the delay places Doane at increased risk for developing future metastatic disease and consequently has a poorer prognosis.  Dr. Kaufman contends that opinion is "sheer conjecture since the stage of the tumor did not change from 2009 to 2012." Id.

With respect to the left kidney lesion, Dr. Kaufman notes that it has not been biopsied.

> Thus, it is unknown whether the mass in the left kidney is benign or malignant.  However, even assuming that the lesion on the left kidney were found on biopsy to be papillary renal cell carcinoma, there is no way to know if the mass originated in both kidneys independently because of its genetic predisposition to do so, or whether it may have spread from the right kidney to the left kidney.

Id. ¶ 29.

Regarding available treatment options, Dr. Kaufman opines that plaintiff's treatment options were not limited by any delay in diagnosis of the renal mass.  Id. ¶ 30.  He asserts that his opinion on this point is supported by and consistent with the AUA Guidelines.  Specifically, had Doane been referred to a urologist in 2009 after his June 30, 2009 CT scan revealed the presence of a 4.5 x 4.1 cm mass, he would have had the same treatment options that Dr. Bratslavsky offered in 2012.  Id. ¶ 31.  Dr. Kaufman contends that the standard of care for a patient like plaintiff, with a history of obesity and diabetes, would have been to offer him a partial nephrectomy in an effort to spare his kidney function, which is exactly what  Dr. Bratslavsky offered to plaintiff.  Id. ¶ 32.  However, Doane chose to undergo a full nephrectomy.  Id. ¶ 32.

Dr. Kaufman notes that Doane's decision on the full kidney removal "was not entirely unreasonable as a radical nephrectomy is associated with less perioperative morbidity than a partial nephrectomy."  Id. ¶ 33.  With regard to outcomes from a partial versus total nephrectomy, he reiterates that medical literature indicates that patients who undergo a partial nephrectomy, and thus are able to preserve kidney function, do not have an improved rate of survival when compared to patients who undergo a radical nephrectomy.  Id. ¶ 34.  Thus, according to Dr. Kaufman, plaintiff's decision to undergo a radical nephrectomy as opposed to a partial, did not compromise his long term survival rate.  Id.

Finally, in his affidavit, Dr. Kaufman addresses alternative treatment options.  From his perspective:

> There is no question that Mr. Doane would *not* have been a candidate for a less invasive procedure, such as ablation, even if he had been referred to a urologist in 2009.  Ablation is not an option for tumors that are greater than 4 cm and Mr. Doane's renal mass measured greater than 4.0 cm in June 2009.

> Moreover, ablation is associated with an increased risk of local recurrence and the incidence of complications associated with this procedure is high.  Ablation is reserved for patients who are unhealthy and cannot undergo surgical resection of the renal mass.  Therefore, it would *not* have been the standard of care to offer Mr. Doane ablation as a viable treatment in 2009.

Id. ¶ 35.  Dr. Kaufman contends this opinion is also consistent with the AUA Guidelines.  Id.

## IV.  LEGAL STANDARDS

### A.  Amendments

Under Federal Rule of Civil Procedure 15, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  FED. R. CIV. P. 15(a)(2); see also Foman v. Davis, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'").

### B.  Summary Judgment

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426

F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. at 250. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Accordingly, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## V. DISCUSSION

Defendant CRMC argues a portion of Dr. Bernie's supplemental expert disclosure and report should be precluded in so much as it alleges negligence dating back to 2006, because such a claim would be untimely. Likewise, CRMC asserts that Doane should be prohibited from adding any such claims to his Amended Complaint. Further, CRMC contends it is entitled to summary judgment on plaintiff's claims because his evidence fails to raise a triable issue as to whether any delay in treatment caused him injury. Instead, multiple expert

opinions reflect that the staging of Doane's right kidney tumor, if it had been diagnosed in 2009 or 2010, would have been the same as the staging that in fact occurred in 2012. CRMC asserts plaintiff's treatment options were no different in 2012 than they would have been if diagnosed in 2009 or 2010.

The doctor defendants contend they are entitled to summary judgment on plaintiff's claims because there exists no material issue of fact which could support a finding that Doane's injuries were caused by their alleged negligent acts. They argue that any alleged delay in the diagnosis of plaintiff's lesion from June 30, 2009 until his time of diagnosis in December 2011, did not affect the treatment he received, change his ultimate outcome, or reduce his chance for a better outcome.

Defendant Government argues it is entitled to summary judgment on plaintiff's claims because his evidence fails to raise a triable issue as to whether any delay in treatment caused him injury.

Plaintiff of course refutes defendants' arguments and cross-moves to serve a SAC to include allegations of negligence and medical malpractice for dates of service March 14, 2006, and to amend his Standard Form 95.

### A. **Plaintiff's Motion to Amend**

With his cross-motion to amend, plaintiff has submitted a proposed SAC, which includes additional allegations of negligence and medical malpractice stemming from the March 14, 2006 CT scan at CRMC. Doane contends his request should be granted on the basis his claim is meritorious, the claim should be decided on the merits, and defendants will not be prejudiced as the trial of this action has not been scheduled and there is sufficient opportunity for defendants to prepare any defense to his SAC.

Defendants argue the proposed amendments are futile and would prejudice them. Specifically, CRMC contends any allegations of negligence occurring before the June 30, 2009 CT scan would be untimely under New York's two and a half year statute of limitations for medical malpractice actions. Further, Doane cannot use the continuous treatment doctrine to toll the statute of limitations.

The Government opposes the SAC on the basis that jurisdiction would be lacking over any 2006 claim against the United States, and that defect cannot be cured. Further, a 2006 claim is barred by the statute of limitations and if permitted, would be prejudicial. Finally, the Government contends plaintiff had the knowledge, or ability to investigate and gain the knowledge required to assert a timely claim in the first instance.

## 1. **FHN's Receipt of the March 14, 2006 CT Scan Report**

First, there is much debate and confusion about what plaintiff knew or should have known with respect to the March 14, 2006 CT scan completed at CRMC.

Initially, in its August 1, 2016 opposition to plaintiff's cross-motion to amend, the Government argued that Doane had not opposed its summary judgment motion and the SAC could not proceed against the United States of America because FHN was never informed that a CT scan was performed at CRMC during plaintiff's March 2006 admission. The Government argued Doane's new claim regarding the March 14, 2006 CT scan thus related only to CRMC and not the United States of America. This was because initially, plaintiff's own cross-motion and expert asserted that neither Doane nor FHN were informed of the March 14, 2006 CT scan findings. The Government argued that because plaintiff conceded that FHN was never notified of the March 14, 2006 CT scan findings, any claim in the

proposed SAC would be futile against the United States of America.  The Government further

contended that the court lacks jurisdiction over the 2006 claim based on FTCA requirements.

However, the Government advised the court by letter on August 5, 2016 that its

position had changed.  The letter explained that on August 2, 2016, CRMC counsel

contacted the Government to advise it was CRMC's position that FHN *was* on notice of the

March 14, 2006 CT scan performed at CRMC *and* that FHN had received a copy of the

report.  Upon receiving this information, the Government reviewed the certified FHN record

produced during discovery in this matter and found a copy of the March 14, 2006 CT scan

report in those records.  The Government immediately contacted plaintiff's counsel and

advised that it appears FHN received copy of the March 14, 2006 CT scan report from

CRMC.  The Government maintained that Doane was nevertheless jurisdictionally barred

from bringing the 2006 claim against the United States of America because he did not

exhaust the 2006 allegation by way of his DHHS Complaint and in any event, he was barred

by the FTCA's two year statute of limitations.

With this new information and in further support of his initial application to amend,

plaintiff filed an additional cross-motion to serve a SAC and amended Standard Form 95.

Doane reiterated that his proposed 2006 claim is meritorious and defendants will not be

prejudiced.  With respect to the merits, plaintiff relies on Dr. Bernie's affirmation which opines

that if in fact FHN received the March 14, 2006 CT scan report and failed to act upon it, the

six year delay in "diagnosis did affect his [Doane's] ability to pursue a minimally invasive

treatment for this tumor."  Bernie Affirm. ¶ 7.  This is because Doane could have been

eligible for percutaneous ablative therapy, which is minimally invasive, due to his tumor being

less than 4 cm in 2006. Dr. Bernie concluded that "[m]ore importantly, this delay could significantly affect his future health and life expectancy." Bernie Affirm. ¶ 8.

As to the timeliness issue, plaintiff argues his otherwise untimely claim is saved by the relation back doctrine because his claim accrued on December 8, 2011 when he was told for the first time he had cancer. The filing of his initial federal complaint on November 14, 2013 was timely and within the FTCA's two year statute of limitations and thus the March 14, 2006 CT scan claim should relate back to that date. Plaintiff insists Rule 15(c) provides a liberal relation back policy. See FED. R. CIV. P. 15(c) ("An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.")

Moreover, Doane contends there was no undue delay in bringing this claim. He asserts that the earliest he could have been aware that FHN actually received the March 14, 2006 CT scan report was in November 2014 when the Government turned over his FHN chart during discovery in this case. See Falgiatano Aff., August 25, 2016, Ex. F ("2014 FHN record").[42] He argues there was confusion and misunderstanding among all parties, even the Government, which led to FHN's receipt of the March 14, 2006 CT scan report not coming to light until early August 2016. Plaintiff points out that after the Government moved to correct its position on summary judgment to reflect that FHN *did* receive the March 14, 2006 CT scan report, he immediately requested leave to amend.

---

[42] The 2014 FHN record submitted by plaintiff in connection with his motion appears to include a total of 492 pages. Also in connection with his motion, Doane has submitted another FHN record produced by the Government in January 2015 in anticipation of a then-upcoming deposition. See Falgiatano Aff., August 25, 2016, Ex. H ("2015 FHN record"). The 2015 FHN record appears to include a total of 745 pages.

In the alternative, Doane contends the FTCA's statute of limitations should be equitably tolled because he acted with reasonable diligence during the time period he seeks to have tolled and he has established that the circumstances are so extraordinary that the doctrine should apply, in particular because he has not contributed to the delay. He reiterates he was not provided with a copy of the March 14, 2006 CT scan report and confirmation it was received by FHN until November 2014, well after the two year statute of limitations had expired.

Plaintiff also clarifies that the first time his FHN medical record was produced in March 2012 (as part of his DHHS Complaint), it *did not* contain the March 14, 2006 CT scan report. See Falgiatano Aff., August 25, 2016, Ex. C ("Doane's 2012 FHN record").[43] However, Doane's 2012 FHN record *did* contain Dr. Steinberg's March 15, 2006 consultation note, which was created while plaintiff was at CRMC. Dr. Steinberg's note mentions the CT scan findings but does not include anything about a follow-up.

Plaintiff contends Dr. Steinberg's consultation was done in CRMC, at CRMC's request, and generated as a CRMC record, hence no one was aware of Dr. Steinberg's connection to FHN. He points out that even the Government did not make the connection between Dr. Steinberg's March 15, 2006 consultation note while Doane was admitted to CRMC and Dr. Steinberg's connection to FHN. Plaintiff also emphasizes that all counsel conducted discovery and went through litigation in this case under the assumption that FHN had not received the March 14, 2006 CT scan report. Doane contends it was not until August 2016

---

[43]  Doane's 2012 FHN record appears to include a total of 408 pages.

that he learned the 2012 FHN record he received was different than the 2014 FHN record he received, and only the latter contained the actual March 14, 2006 CT scan report.[44]

Doane thus concludes that the statute of limitations should be tolled and he should be permitted to add the 2006 allegations which he would have included at the beginning of this litigation had a proper and complete copy of his FHN record been provided to him.  It follows that if his proposed SAC is accepted, he will also need to amend his Standard Form 95 for his DHHS administrative claim, and requests leave to do so.

In opposition, the Government reiterates that leave to amend should be denied because the court lacks jurisdiction over the 2006 claim against the United States of America and that defect cannot be cured.  It asserts Doane knew about the March 14, 2006 CT scan at the time he filed his State court complaint on July 12, 2012 and it was a tactical choice *not* to include the 2006 claim because it was beyond New York's two and a half year statute of limitations.  Moreover, the continuous treatment doctrine would not have saved the 2006 claim because the lawsuit was for a failure to diagnose, in other words, a failure to initiate a course of treatment.  Therefore, Doane was limited to asserting claims based on scans performed within the two and a half year statute of limitations and thus he chose not to include the 2006 claim in his State court complaint against CRMC and its doctors.

The Government points out that discovery began thereafter in Doane's state court case and he obtained CRMC records and took numerous depositions of treating CRMC providers.  The CRMC records contain reference to a Dr. Steinberg who, had plaintiff chosen to investigate, was employed by FHN.  Specifically, the CRMC records contained the March

---

[44]  Plaintiff notes the 2015 FHN record also contained the March 14, 2006 CT scan report.

14, 2006 CT scan report which carbon copied Dr. Steinberg. The CRMC records also included Dr. Steinberg's March 15, 2006 consultation note.

While plaintiff points out that the Government itself did not even know of Dr. Steinberg's relationship, the Government notes that Dr. Steinberg was never investigated at the DHHS level because Doane never brought a claim relating to the March 14, 2006 CT scan. After CRMC contacted the Government in August 2016 regarding FHN's receipt of that scan in 2006, DHHS counsel confirmed that Dr. Steinberg was in fact a FHN employee during the applicable time.

The Government also disputes that November 2014 was the first time Doane had access to a FHN record containing evidence of FHN's receipt of the March 14, 2006 CT scan report. Instead, it contends plaintiff was in possession of that information as early as July 2012 after DHHS requested he submit evidence to assist in investigating his DHHS Complaint. In response to that request, plaintiff obtained and submitted to DHHS three CDs containing medical records, one of which was his FHN record. The Government has submitted what it asserts is the FHN record DHHS received from plaintiff on July 12, 2012. See Clark Aff., Sept. 16, 2016, Ex. F ("Gov'ts 2012 FHN record"). The Gov'ts 2012 FHN record contains 411 pages and includes Dr. Steinberg's March 15, 2006 consultation note on page 295.[45]

In further support of its position that plaintiff could have earlier realized Dr. Steinberg's involvement, the Government points out that Doane was provided additional copies of FHN

---

[45] The Government appears to insinuate that in his cross-motion to amend, plaintiff intentionally attached only a portion of the 2012 FHN record. The Government makes this assertion on the basis that Doane's 2012 FHN record is only 208 pages, while he sent records of 411 pages to DHHS. The Government is mistaken in its calculation; Doane's 2012 FHN record appears to include a total of 408 pages.

records (the 2014 FHN record).  Later, when the Government realized the 2014 FHN record was not complete, it thereafter sent a full, certified copy to plaintiff (the 2015 FHN record).

By the time of Nurse Practitioner Kathleen Fitzgerald's ("N.P. Fitzgerald") deposition on January 9, 2015, Doane had received at least three sets of the FHN record which contained clues as to Dr. Steinberg's and FHN's receipt of the March 14, 2006 CT scan findings.  In particular, the 2015 FHN record the Government used at N.P. Fitzgerald's deposition contained copies of the March 14, 2006 CT scan report *and* Dr. Steinberg's March 15, 2006 consultation note.  Plaintiff's counsel asked N.P. Fitzgerald questions using the bates stamped 2015 FHN record, including asking how Doane came under her care in 2006. Plaintiff's counsel recognized that Doane went to FHN prior to 2006, but failed to ask N.P. Fitzgerald who treated him before 2006.  Counsel also asked N.P. Fitzgerald about the CRMC CT scans from June 30, 2009 forward, but never asked about the March 14, 2006 CT scan.

Plaintiff never deposed any other FHN providers nor served discovery demands on the Government to inquire into which FHN provider treated Doane before N.P. Fitzgerald began treating him in 2006.  Nor did Doane conduct additional discovery as to CRMC to inquire further about his March 2006 hospitalization, the March 14, 2006 CT scan, or the communication of either to any of his other providers.

Moreover, plaintiff's supplemental expert disclosure dated January 15, 2016 noted that a 2006 CT scan showed a right kidney lesion at 2.1 cm which had increased in size by the time of a 2009 CT scan.  Because plaintiff's own expert Dr. Bernie, in the supplemental expert disclosure, noted that plaintiff's primary care provider was never informed of the 2006 CT scan findings, the Government relied on this statement in preparing its motion for

summary judgment. The Government contends it also relied on fact that Doane had never alleged negligence against the United States of America for claims dating back to 2006 nor had he alleged that any FHN provider other than N.P. Fitzgerald had been negligent. The Government asserts that it acted quickly as soon as it learned on August 2, 2016 that CRMC believed FHN did in fact receive the March 14, 2006 CT scan report. According to the Government, "[p]laintiff cannot re-litigate this entire case simply because his new expert can only give him an opinion that creates a causal nexus between the study in 2006 and the claimed injury." Gov'ts Mem. of Law in Opp'n to Pl.'s Mot. for Leave to Am., 20.

Finally the Government contends there is no legal basis to toll the FTCA's statute of limitations and while not jurisdictional in nature, Doane has not alleged the sort of facts required for equitable tolling.

### 2. Accrual of the 2006 Claim

Plaintiff contends he was precluded from bringing the March 14, 2006 CT claim any earlier because it was not included in the first FHN record he received, Doane's 2012 FHN record. However, even assuming Doane's 2012 FHN record did not contain the actual March 14, 2006 CT scan report, it is undisputed that record contained Dr. Steinberg's March 15, 2006 consultation note which mentioned that a CT scan of the abdomen showed a right renal cystic-like lesion. Therefore, as early as 2012, plaintiff was in possession of a FHN record containing information to pursue the possibility that Dr. Steinberg was notified of the March 14, 2006 CT scan findings, investigate her relationship with FHN, and bring such a claim.

Moreover, Doane's July 12, 2012 State court complaint noted that the June 30, 2009 CT scan "revealed a 4.5 x 4.1 cm lesion *that had increased from* 2.3 x 2.0 cm in March 2006." See State court complaint ¶ 28 (emphasis added). Therefore plaintiff knew at the

time he filed his State court complaint in 2012 that a smaller lesion had been seen in March 2006.

Moreover, even the June 30, 2009 CT scan report itself, which plaintiff relies heavily upon in this case, documented the presence of a 4.5 x 4.1 cm lesion in the lower pole of the right kidney *that increased from 2.3 x 2.0 cm*. Despite this, he has never conducted any discovery related to any 2006 CT scan.

Doane does not allege that he was prevented from discovering Dr. Steinberg's involvement in his March 2006 CRMC admission or prevented from discovering when and if she or anyone else at FHN knew about or received the March 14, 2006 CT scan report.

### 3.  Timeliness of the 2006 Claim

In any event, any claim of negligence relating to the March 14, 2006 CT scan would be untimely under both New York's two and a half year statute of limitations and the FTCA's two year statute of limitations.

An action for medical malpractice in New York State must be commenced within two years and six months of accrual. N.Y.C.P.L.R. § 214–a. The limitations period, however, may be tolled until after a plaintiff's last treatment under the continuous treatment doctrine. Id. The continuous treatment doctrine permits a patient to delay filing a lawsuit so that he can continue with corrective treatment and avoid undermining the continuing trust in the doctor-patient relationship. See Massie v. Crawford, 78 N.Y.2d 516, 519 (1991) ("The doctrine rests on the premise that the trust and confidence that marks such relationships puts the patient at a disadvantage in questioning the doctor's skill because to sue while undergoing treatment necessarily interrupts the course of treatment.").

Doane alleges that the failure to inform him of the March 14, 2006 CT scan results and failure to treat him for his kidney cancer at that time arises out of a course of treatment which continues through December 8, 2011 when he was finally notified and diagnosed with kidney cancer.  Therefore, his March 14, 2006 negligence claim would be timely.  However, the failure to diagnose and treat a condition does not amount to a course of continuous treatment under § 214–a.  Nykorchuck v. Henriques, 78 N.Y.2d 255, 259 (1991) ("While the failure to treat a condition may well be negligent, we cannot accept the self-contradictory proposition that the failure to establish a course of treatment is a course of treatment.").  Accordingly, Doane cannot rely on the continuous treatment doctrine to revive an otherwise untimely claim.

Nor can plaintiff rely upon the diligence-discovery rule of accrual to toll the statute of limitations.  "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements:  (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Mottahedeh v. United States, 794 F.3d 347, 352 (2d Cir. 2015) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).  Doane cannot establish either element.

First, as it solely relates to uncovering who was on notice of the March 14, 2006 CT scan findings, it cannot be said that plaintiff diligently pursued this issue:  as early as 2012 he knew that a CT scan performed in March 2006 at CRMC showed a lesion on his right kidney.  Moreover, it is undisputed the 2014 FHN record received by plaintiff in November 2014, during discovery in this case, contained the March 14, 2006 CT scan report.  Likewise, it is undisputed that the 2015 FHN record received by plaintiff in January 2015, prior to N.P.

Fitzgerald's deposition, contained the March 14, 2006 CT scan report. Therefore, Doane has failed to establish the first element required for equitable tolling.

Further, there is nothing extraordinary about this case. "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." Harper v. Ercole, 648 F.3d 132, 137 (2d Cir. 2011). "To secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances. He must further demonstrate that those circumstances caused him to miss the original filing deadline." Id. "Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." Wallace v. Kato, 549 U.S. 384, 396 (2007).

Doane does not contend he was prevented from uncovering whether any one of his providers was notified of the lesion seen on the March 14, 2006 CT scan. Nor does he assert he was prevented from uncovering Dr. Steinberg's relationship with FHN. He avers nothing particular, let alone extraordinary about why he could not earlier uncover this claim. Thus, plaintiff cannot establish the second element required for equitable tolling.

For these reasons, Doane cannot rely on equitable tolling to save an otherwise untimely claim.

### 4. **Amendment of Standard Form 95**

Finally, even if timely, any claim against the United States of America arising from the March 14, 2006 CT scan would futile because jurisdiction would be lacking.

"The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." McGowan v. United States, 825 F.3d 118, 125 (2d Cir. 2016) (internal quotations omitted). A plaintiff likewise bears the burden of showing that he

exhausted his administrative remedies by presenting his claim to the appropriate federal agency before filing suit. See 28 U.S.C. § 2675(a); Cooke v. United States, 918 F.3d 77 (2d Cir. 2019); see also Mora v. United States, 955 F.2d 156, 160 (2d Cir. 1992) ("[P]resentment is a prerequisite to the institution of a suit under the FTCA."). In addition, matters concerning the waiver of sovereign immunity must be strictly construed in favor of the government. Cooke, 918 F.3d at 77 (citing United States v. Sherwood, 312 U.S. 584, 590 (1941)).

In his DHHS Complaint, plaintiff alleged that the reports from CT scans performed at CRMC in 2009 and 2010 were forwarded to FHN, but his primary care provider did not follow-up on the finding of a right renal mass on his kidney. His DHHS Complaint included no allegation or mention of a 2006 CT scan. In fact, Doane's Standard Form 95 listed "6/30/09" in the "Date and Day of Accident" box and his accompanying narrative specifically mentioned the June 30, 2009, January 26, 2010, and April 14, 2010 scans. Even if plaintiff now claims he was unaware of the 2006 CT scan at the time he filed his DHHS Complaint on May 10, 2012, he knew about that scan as early as July 11, 2012 when he filed his State court complaint. Yet, he failed to amend his DHHS Complaint to include anything about a 2006 CT scan.

Doane did not allege in his DHHS Complaint any negligence dating back to 2006. The DHHS issued a final determination on March 12, 2014 denying his administrative claim. There is no relation back provision for filing an amended administrative claim and plaintiff points to no legal authority which would allow him to now amend a closed administrative claim. He could have amended his DHHS Complaint prior to the time of final agency action but he did not. "The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court. This requirement is jurisdictional and cannot

be waived." Celestine v. Mount Vernon Neighborhood Health Ctr., 403 F.3d 76, 82 (2d Cir. 2005).

Accordingly, plaintiff's cross-motion to file a SAC to add allegations relating to the March 14, 2006 CT scan and to file an amended Standard Form 95 will be denied. Doane could have asserted this claim earlier, it is untimely under both state and federal law, and jurisdiction would not exist in this court to hear an unexhausted FTCA claim.

**B. Dr. Bernie's Opinion as to the March 14, 2006 CT Scan**

The denial of plaintiff's cross-motion to amend will result in the grant of defendant CRMC's motion to preclude and/or strike.

As Doane will be prohibited from adding a negligence claim relating to the March 14, 2006 CT scan and lack of follow-up, that portion of Dr. Bernie's expert disclosure and testimony relating to the same will be precluded. Thus, any claims of negligence dated before June 30, 2009 will be stricken. Any allegations that a delay in treatment from 2006 caused plaintiff's injuries will be precluded. Likewise, any allegations that he would have had a more favorable outcome or more desirable treatment options had he been informed of, or treated for the mass in 2006, will be precluded. No medical malpractice claim stemming from the March 14, 2006 CT scan has been asserted in the Amended Complaint and for the reasons described above, will not be added now.

However, the parties are advised that during trial, Doane *will* be permitted to offer evidence of the March 14, 2006 CT scan and findings as background information relative to his medical history and records.

## C.  Plaintiff's Medical Malpractice Claim

Under New York law, the "essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury." DiMitri v. Monsouri, 302 A.D.2d 420, 421 (N.Y. App. Div. 2d Dep't 2003).  In moving for summary judgment, each set of defendants must make a prima facie showing that they "did not depart from good and accepted medical practice or that any departure did not proximately cause plaintiff's injuries." Ducasse v. N.Y.C. Health & Hosps. Corp., 148 A.D.3d 434, 435 (N.Y. App. Div. 1st Dep't 2017).

In order to rebut this showing and survive summary judgment, a plaintiff "must submit evidentiary facts or materials," typically through expert testimony, and "demonstrate the existence of a triable issue of fact." Alvarez v. Prospect Hosp., 68 N.Y.2d 320, 324 (1986); see also Sitts v. United States, 811 F.2d 736, 739 (2d Cir. 1987).  A plaintiff's expert testimony need only rebut the prima facie showing made by the defendants.  See Stukas v. Streiter, 83 A.D.3d 18, 30 (N.Y. App. Div. 2d Dep't 2011).  In general, "[s]ummary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions.  Such conflicting expert opinions will raise credibility issues which can only be resolved by a jury." DiGeronimo v. Fuchs, 101 A.D.3d 933, 936 (N.Y. App. Div. 2d Dep't 2012) (internal citations and quotations omitted).

To reiterate, Doane's medical malpractice claim can be divided into two theories of liability based on various alleged deviations from the standard of care:  (1) failure to timely diagnose and the resulting delay in treating Doane's kidney cancer, and (2) failure to obtain

plaintiff's informed consent.[46]  Thus, in moving for summary judgment, each set of

defendants must make a prima facie showing that CRMC, the doctor defendants, and FHN,

respectively, did not depart from the standard of care in these areas, or that any deviation did

not cause the claimed injury.

    As articulated above, the facts as they relate to the 2009 and later imaging are almost

entirely undisputed.  There can be no dispute that the delay in diagnosing plaintiff's kidney

cancer, even from 2009 on, was a deviation from the standard of care and no expert has

opined to the contrary.[47]  Instead, this entire case rests on whether that departure from the

standard of care (i.e. the delay) was a proximate cause of any injury.

    Defendants' experts, oncologist Dr. Poiesz and urologist Dr. Kaufman, both opine

that any delay in diagnosis did not cause Doane injury.  The two doctors assert that plaintiff's

cancer staging never changed from June 30, 2009 through December 8, 2011 when he was

finally notified of the mass.

    At the point of the June 30, 2009 CT scan, it is undisputed the mass was a stage T1b.

Ablation would not have been an option for Doane at that time because the mass was

greater than 4 cm.  If plaintiff had been referred to a urologist after June 30, 2009, his

treatment options to address the mass would have been to either undergo a partial

---

[46]  Plaintiff's informed consent cause of action is essentially the same as his failure to timely diagnose
cause of action.  Traditionally, an action to recover damages for lack of informed consent was viewed as the
common law tort of assault and battery.  See, e.g., Moore v. Shahine, No. 18 CIV 463, 2019 WL 948349, at
*3 (S.D.N.Y. Feb. 27, 2019).  However, "the modern view is that the failure of a doctor to properly inform his
patient of the risks of an operation is a form of medical malpractice based on negligence."  Id.  Similarly, it is
defendants' alleged failure to properly inform Doane of the nature, effects, consequences, complications,
risks, and alternative procedures and treatments to the course of care and treatment (which  in this matter
included no course of treatment at all) undertaken by defendants for Doane's condition.  See Am. Compl.
¶ 67.

[47]  To the extent that any medical experts mentioned the deviation from the standard of care in their
reports, it has not been included in this Memorandum–Decision and Order.

nephrectomy or a radical nephrectomy. These are the same treatment options offered by Dr. Bratslavsky in early 2012.

At the point of the January 26, 2010 CT scan, it is undisputed the mass was a stage T1b. Likewise, ablation would not have been an option for Doane at that time because the mass was greater than 4 cm. If plaintiff had been referred to a urologist after January 26, 2010, his treatment options to address the mass would have been to either undergo a partial nephrectomy or a radical nephrectomy. These are the same treatment options offered by Dr. Bratslavsky in early 2012.

At the point of the April 14, 2010 CT angiogram, it is undisputed the mass was a stage T1b. Again, ablation would not have been an option for Doane at that time because the mass was greater than 4 cm. If plaintiff had been referred to a urologist after April 14, 2010, his treatment options to address the mass would have been to either undergo a partial nephrectomy or a radical nephrectomy. These are the same treatment options offered by Dr. Bratslavsky in early 2012.

It is also undisputed that at the time plaintiff finally learned about his cancer following the December 8, 2011 CT scan, the mass was still a stage T1b. To reiterate, at all times between June 30, 2009 and December 8, 2011, it is undisputed Doane's right renal mass was a stage T1b. *However*, defendants' and plaintiff's experts offer conflicting opinions regarding the long term effects that the delay has had and will have on Doane.

The Government's expert Dr. Kaufman opines that although the tumor was larger when removed compared to when first noted on imaging, the stage did not change, hence the long term prognosis remains the same. By contrast, plaintiff's expert Dr. Bernie, even putting aside his opinion as it relates to the 2006 scan, opines that the future development of

metastatic disease and risk of death from renal cell carcinoma correlates with tumor size. Dr. Bernie contends that defendants' delay in diagnosis could significantly affect Doane's future health and life expectancy.

The expert doctors also offer conflicting opinions with respect to the lesion found on plaintiff's left kidney. Defendants assert that no one has ever told Doane that the mass on his left kidney spread from the mass on his right kidney. The Government's expert Dr. Kaufman points out that plaintiff's left kidney mass has never been biopsied and it is unknown if the mass is malignant. Even assuming it is a papillary renal cell carcinoma, Dr. Kaufman asserts there is no way to know if the mass arose independently in the left kidney because of its genetic predisposition to do so, or whether it spread from the right kidney to the left kidney. By contrast, plaintiff's expert Dr. Bernie opines that the development of a growing lesion in Doane's sole kidney is cause for concern and notes that although it does not have characteristics *currently* diagnostic of a malignancy, its appearance and growth raise the distinct possibility of a metachronous or metastatic lesion.

After careful review of the record, plaintiff has raised genuine issues of material fact by putting forth a conflicting expert opinion as to whether the delay in diagnosing his kidney cancer caused him injury. Such conflicting expert opinions raise credibility issues which can only be resolved by a jury; these issues of fact must be resolved at trial. See Hodosh v. Block Drug Co., Inc., 786 F.2d 1136, 1143 (Fed. Cir. 1986); Penrose v. United States, No. 1:13-CV-1060, 2016 WL 796062, at *6 (N.D.N.Y. Feb. 24, 2016) ("Thus, given the conflicting expert testimony, there are questions of fact that are best left to the fact finder to determine."); Monell v. Scooter Store, Ltd., 895 F. Supp. 2d 398, 412 (N.D.N.Y. 2012) (D'Agostino, J.) ("[T]he fact that Defendants have presented conflicting expert testimony . . .

creates questions of fact and credibility determinations to be answered by the jury."); <u>Speller</u> <u>v. Sears, Roebuck & Co.</u>, 100 N.Y.2d 38, 44 (2003) ("Where causation is disputed, summary judgment is not appropriate unless only one conclusion may be drawn from the established facts.") (internal quotations omitted); <u>Deutsch v. Chaglassian</u>, 71 A.D.3d 718, 719 (N.Y. App. Div. 2d Dep't 2010) ("Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions. Such credibility issues can only be resolved by a jury.").

## VI. <u>CONCLUSION</u>

Any claims of negligence stemming from the March 14, 2006 CT scan would be barred by both the New York and the FTCA statutes of limitations. Further, the 2006 claim is unexhausted as Doane did not and cannot now present it at the administrative level as required. Thus, jurisdiction is lacking over that claim as it pertains to the United States of America. Moreover, there are serious doubts as to whether plaintiff was unaware until November 2014 that FHN was in fact on notice of the March 14, 2006 CT scan findings. For all of these reasons, plaintiff's cross-motion to amend will be denied.

Accordingly, defendant CRMC's motion to strike portions of Dr. Bernie's report will be granted and any allegations of negligence stemming from the March 14, 2006 CT scan or delay in diagnosis from 2006 will be precluded. However, plaintiff will be permitted to adduce evidence at trial of the March 14, 2006 CT scan and findings as it relates to his timeline and medical history.

Finally, material issues of fact prevent the grant of defendants' various motions for summary judgment. The conflicting expert opinions produce exactly the type of factual

disputes which must be decided by a jury.  Therefore, defendants' respective motions for summary judgment will be denied and this matter will be set for trial.

Therefore, it is

ORDERED that

1.  Defendant Cortland Regional Medical Center's motion is GRANTED in part and DENIED in part;

2.  Defendant Cortland Regional Medical Center's motion to strike/preclude is GRANTED;

3.  Defendant Cortland Regional Medical Center's motion for summary judgment is DENIED;

4.  Defendants Diego Alvarez and Dilip Roy's motion for summary judgment is DENIED;

5.  Defendants United States of America and the Department of Health and Human Services at the Family Health Network of Central New York, Inc.'s motion for summary judgment is DENIED;

6.  Plaintiff Ronald Doane's cross-motion to amend is DENIED; and

7.  Trial is scheduled for Monday, June 17, 2019, in Utica, New York, with pre-trial papers to be filed on or before 12:00 p.m. on Monday, June 3, 2019.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  March 29, 2019
          Utica, New York.